# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MORTGAGE ELECTRONIC )<br>REGISTRATION SYSTEMS, INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>KOSTAS PHYLACTOS, ADRIANNA )<br>PHYLACTOS, THE RIVER BEND )<br>HOMEOWNERS ASSOCIATION, and )<br>HARRIS BANK NAPERVILLE, )<br>)<br>Defendants. )<br>) | No. 03 C 9225<br>Judge Joan H. Lefkow |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mortgage Electronic Registration Systems, Inc. ("MERS"), filed this foreclosure action against defendants Kostas and Adrianna Phylactos ("Debtors") to foreclose on a mortgage Debtors granted MERS on Debtors' real estate (the "Subject Property"). Defendant Harris Bank Naperville ("Harris Bank") asserts a lien against the Subject Property in the amount of $34,038.75 in attorney fees and $2,239.74 in costs incurred during a dispute with the Debtors that resulted in a judgment being entered in favor of Harris Bank and against the Debtors for the Debtors' violation of the declaration of covenants recorded against the subdivision in which the Subject Property is located. In its Amended Complaint, MERS names Harris Bank as a defendant in the foreclosure action, seeking to subordinate Harris Bank's lien to MERS' mortgage. MERS is a corporation incorporated under the laws of the state of Deleware and has its principle place of business in the state of Virginia. Debtors are citizens of the state of Illinois. The River Bend Homeowners Association is incoporated under the laws of the state of Illinois

and has its principal place of business in Illinois. Harris Bank is incorporated under the laws of the state of Illinois and has its principal place of business in Illinois. As the parties' filings indicate that MERS is the lender as well as the holder of the mortgage at issue, *see Mortgage Electronic Registration System, Inc. v. Estrella*, 390 F.3d 522, 525 (7th Cir. 2004), diversity jurisdiction is properly invoked pursuant to 28 U.S.C. § 1332. Before the court is Harris Bank's Motion for Summary Judgment. For the reasons stated below, the court grants the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

2

## FACTS

Harris Bank, as Trustee under Trust Agreement dated July 4, 1994 and known as Trust Number 5557 (the "Trust"), is an Illinois trust and was the owner of fee simple title to certain real estate in the Village of Bolingbrook, Illinois known as the River Bend Unit 1 Subdivision (the "Subdivision"). (Harris Bank's L.R. 56.1 ¶ 1.) On February 27, 1995, Harris Bank impressed on all properties in the Subdivision a "Declaration of Covenants, Restrictions, and Easements River Bend Unit 1 Subdivision" (the "Declaration"). (*Id.*, Ex. A.)

The Sixth Recital of the Declaration provides,

> Declarant desires and intends that the several owners, mortgagees, occupants, and other persons acquiring any interest in the [Subdivision] shall at all times hold their interests subject to the rights, priorities, easements, covenants, conditions, restrictions, liens, and charges hereinafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the attributes of the [Subdivision]."

(*Id.* ¶ 4.)

Article VI, Section 10 of the Declaration provides that "any lot owner desiring to erect a fence upon a lot shall first obtain approval therefor pursuant to the provisions of Article VII of this Declaration." (*Id.* ¶ 5.) The Section further provides that

> all fences constructed within the [subdivision] shall fully comply with applicable ordinances of the Village and all necessary and appropriate permits required by the Village or other applicable authority for such fence shall be procured by the constructing party prior to the commencement of construction.

(*Id.* ¶ 6.)

Article VII, Section 1 of the Declaration provides that

> no construction [in the Subdivision] of a . . . fence . . . shall be commenced, erected, or maintained . . . until the construction plans and specifications, showing the nature, kind, shape, height, materials, color scheme, proposed location on the Lot, approximate cost of

3

such building or other structure, and the grading plan and landscape plan of the Lot to be built upon shall have been submitted and approved in writing by [Harris Bank].

(*Id.* ¶ 8.)

Article X, Section 1 provides that "[t]he covenants and restrictions of this Declaration shall run with and bind the land and shall inure to the benefit of and be enforceable by [Harris Bank]." (*Id.* ¶ 9.) Article X, Section 7 provides,

> Each grantee of [Harris Bank] by the acceptance of a deed of conveyance, and each purchaser under any contract for such deed of conveyance, accepts the same subject to all restrictions, conditions, covenants, reservations, liens, and charges, and the jurisdiction, rights, and powers created or reserved by this Declaration, and all rights, benefits, and privileges . . . and all impositions and obligations hereby imposed shall be deemed and taken to be covenants running with the land, and shall bind any person having at any time any interest or estate in said land . . . .

(*Id.* ¶ 10.) Article X, Section 9, further provides that

> in the event of any default of any owner under the provisions of this Declaration, . . . [Harris Bank], the association, other owners, and the Village shall have each and all of the rights which may be respectfully provided for them in this Declaration, or which may be available at law or in equity and may prosecute any action or other proceeding for enforcement . . . or for damages or . . . injunction or specific performance, . . . or for any combination of remedies, or for any other relief. All expenses of [Harris Bank], the association, such other owners, or the Village in connection with such actions or proceedings, including court costs and attorneys' fees and other fees and expenses, shall be charged to and assessed against such defaulting owner.

(*Id.* ¶ 11.)

The First Amendment to the Declaration added an Article IV, Section 8, which provides

> Notwithstanding anything contained herein to the contrary, the lien of the assessments provided for herein shall be subordinate to the lien of any first mortgage or trust deed in the nature of a mortgage now or hereafter placed upon the property subject to Association Assessment; provided, however, that such subordination shall apply only to the assessments and liens which have become due or payable prior to the sale or transfer of such property pursuant to a decree of foreclosure, or any other proceeding in lieu of foreclosure. Such sale or transfer shall not relieve such property from any liability for any

Association assessments thereafter becoming due, nor from the lien of any such subsequent assessment.

(*Id.* ¶ 13.)

On April 7, 2000, Harris Bank filed a Complaint in the Circuit Court of Will County, Illinois, alleging that Debtors breached the Declaration by failing to obtain architectural approval for a fence constructed on the Subject Property. (*Id.* ¶ 14-15, Ex. B.) On June 10, 2002, Harris Bank caused a *lis pendens* notice to be recorded against the Subject Property. (*Id.* ¶ 16.)

On May 19, 2000, Debtors granted Fidelity Mortgage, Inc. ("Fideltiy") a mortgage on the Subject Property for $203,000. (MERS' Statement of Add'l Facts ¶ 1.) The same day, Debtors granted Bank One, N.A. a mortgage on the Subject Property for $92,000. (*Id.* ¶ 4.) Both Fidelity's mortgage and Bank One's mortgage were recorded on May 30, 2000. (*Id.* ¶ 1, 4.) Fidelity's mortgage was assigned to Delta Funding Corp.("Delta") on May 19, 2000. The assignment was recorded on June 12, 2000. (*Id.* ¶ 2.) Delta, in turn, assigned the mortgage to Countrywide Home Loans ("Countrywide") on February 14, 2001, and the assignment was recorded on September 17, 2001. (*Id.* ¶ 3.)

On or about July 22, 2002, MERS ordered a title commitment on the Subject Property from Stewart Title Guaranty Company. Exception number 3 to the title commitment is Harris Bank's *lis pendens* notice. (Stewart Title Guaranty Company Title Commitment 12457.)

Harris Bank alleges that on August 27, 2002, counsel for Harris Bank had a series of telephone calls with a person who represented herself as Amy Stellatos ("Stellatos"), who told counsel for Harris Bank that she worked for a lender that was considering lending money to the Debtors. (Harris Bank's L.R. 56.1 ¶ 17-18.) Stellatos allegedly asked counsel for Harris Bank

about the nature of the lawsuit pending against the Subject Property, how much money in attorney fees had been incurred up to that point, and whether the amount was the subject of a judgment lien. Counsel for Harris Bank allegedly told Stellatos that he did not know the exact amount of attorney fees incurred in the case, but that it was in excess of $15,000 to date. (*Id.* ¶ 19-20.) Counsel for Harris Bank also allegedly told Stellatos that the matter related to a fence being removed and that while a judgment had not yet been obtained, the attorney fees were a lien against the property regardless of when a final judgment is entered. (*Id.* ¶ 21.) Stellatos allegedly asked counsel for Harris Bank to send her a letter identifying the exact amount of attorney fees to date. On or about August 28, 2002, counsel for Harris Bank faxed a letter to Stellatos that indicated that the attorney fees related to the lawsuit were in an amount that "well exceeds $15,000.00" and that "any judgment will become a lien against the Property as per the Declaration of Covenants recorded against all properties in the Subdivision." (*Id.* ¶ 22-23.) MERS denies all of Harris Banks' allegations regarding Stellatos.

On September 3, 2002, MERS paid and satisfied the prior mortgages of Countrywide and Bank One. (MERS' Statement of Add'l Facts ¶ 5-6.) A Release of Bank One's mortgage was executed on September 9, 2002 and recorded on September 25, 2002. (*Id.* ¶ 7.) A release of Countrywide's mortgage was executed on October 25, 2002 and recorded on November 13, 2002. (*Id.* ¶ 8.) On September 12, 2002, Debtors granted MERS a mortgage on the Subject Property (Harris Bank's L.R. 56.1 ¶ 24.) The mortgage was recorded on September 12, 2002. (*Id.* ¶ 25.)

On March 14, 2003, Harris Bank obtained a judgment against the Debtors for failure to remove the fence on the property. (*Id.* ¶ 26.) The judgment provided that the Debtors had to

6

remove the fence within fourteen days. Harris Bank was also awarded attorney fees and costs, subject to a hearing on the issue of fees. On April 22, 2003, the court entered an order amending the judgment to provide that the Debtors were to pay Harris bank $34,038.75 in attorney fees and $2,239.74 in costs. (*Id.* ¶ 27-28.) On June 16, 2003, Harris Bank recorded a Memorandum of Judgment against the Subject Property related to the costs and fees incurred in the state court action.

## DISCUSSION

Generally, a lien, including a mortgage, that is first in time has priority and is entitled to prior satisfaction of the property it binds. *Cole Taylor Bank v. Cole Taylor Bank*, 586 N.E.2d 775, 780 (Ill. App. 1st Dist. 1992). The first question before the court, then, is which lien, MERS' or Harris Bank's, was first in time. MERS argues that state court judgment in favor of Harris Bank only attached as a lien on the Subject Property on June 16, 2003, when Harris Bank recorded its Memorandum of Judgment with the recorder, citing *Casey National Bank v. Roan*, 668 N.E.2d 608, 612 (Ill. App. 4th Dist. 1996) ("A judgment becomes a lien on the real estate of the person against whom it is entered only from the time the judgment is filed in the office of the recorder of deeds in the county in which the real estate is located."). Thus, MERS argues that its mortgage, which was recorded on September 12, 2002, was first in time and has priority.

Harris Bank, however, filed a *lis pendens* notice with the recorder's office on June 10, 2002, three months before MERS recorded its mortgage. Under the Illinois *lis pendens* statute, the filing of a *lis pendens* notice constitutes constructive notice to "persons subsequently acquiring an interest in or lien on the property affected thereby," and

7

every such person and every person acquiring an interest or lien as above stated, not in possession of the property and whose interest or lien is not shown of record at the time of filing such notice, shall, for the purposes of this Section, *be deemed a subsequent purchaser and shall be bound by the proceedings to the same extent and in the same manner as if he or she were a party thereto.*

735 ILCS 5/2-1901 (emphasis added). Thus, Harris Bank contends, the fact that Harris Bank recorded its judgment lien after MERS recorded its mortgage has no bearing on priority of the liens. Thus, because Harris Bank recorded a *lis pendens* notice before MERS recorded its mortgage, MERS is charged with constructive notice of the suit affecting the property and is therefore deemed a "subsequent purchaser."

Under Illinois law, the doctrine of "first in time, first in right" is "not always as clear and obvious as it may seem" and "blind adherence to the first in time, first in right doctrine is sometimes insufficient to determine lien priority." *Aames Capital Corp.* v. *Interstate Bank of Oak Forest*, 734 N.E.2d 493, 496-97 (Ill. App. 2d Dist. 2000). Indeed, the doctrine of subrogation creates an exception to the "first in time, first in right" rule. Subrogation is a method whereby one who has involuntarily paid the debt of another succeeds to the rights of the other with respect to the debt paid. *Id.* at 497.

There are two types of subrogation: conventional and equitable. *Id.* 498. Conventional subrogation arises from an agreement between the parties that the subrogee pay a debt on behalf of a third party and, in return, be able to assert the rights of the original creditor. *Id.* (citing *Home Savings Bank* v. *Bierstadt*, 48 N.E. 161, 162 (1897)). In *Bierstadt*, the court defined conventional subrogation as a right "springing from an express agreement with the debtor where the subrogee advances money to pay a claim, which carries a lien, and where the subrogee and the debtor agree that the subrogee is to have an equal lien to the one paid off." 48 N.E. at 161.

Here, MERS does not contend that there was any express agreement between itself and the debtors that MERS, in return for paying off the claims of the original creditors, would be able to assert the rights of those creditors. Without such an express agreement, MERS has no right to conventional subrogation. *See Firstmark Standard Life Ins. Co. v. Superior Bank FSB*, 649 N.E.2d 465, 469 (Ill. App. 1st Dist. 1995) ("The linchpin of all these [conventional subrogation] cases, then, is the existence of an express agreement that the interests of a subsequent mortgagor are to be advanced to a first mortgage. It therefore follows that the courts in Illinois have been unwilling to apply the doctrine of conventional subrogation on the basis of an implied agreement."); *see also Western United Dairy Co. v. Continental Mortgage Co.*, 170 N.E.2d 650, 651 (Ill. App. 1st Dist. 1960) (requiring an "express (though not necessarily written) agreement" for conventional subrogation to apply).

Although conventional subrogation is "seen sporadically in Illinois case law, equitable subrogation is even more elusive." *Aames*, 734 N.E.2d at 498. In *Mutual Insurance Co. v. LaFramboise*, 597 N.E.2d 622, 624 (1992), the Illinois Supreme Court explained that there is "no general rule which can be laid down to determine whether a right of subrogation exists since this right depends upon the equities of each particular case." One of the few modern applications of equitable subrogation under Illinois law is seen in *Detroit Steel Products Co. v. Hudes*, 151 N.E.2d 136 (1958). In *Detroit Steel*, the court was faced with the competing lien claims of a bank mortgagee, which had paid off several mechanics liens or materialmen claimants in acquiring what it thought was a first priority mortgage, and the claims of subsequent materialmen claimants. The court explained that, when the loan was made, the mortgagee bank had inquired as to unpaid liens and made a physical inspection of the premises. "Having been told of two

9

claims of materialmen, the bank required that [the debtor] pay these claims . . . out of the loan proceeds." *Id.* at 137. However, other mechanics liens, held by materialmen who delivered materials to the property after the bank's mortgage was recorded but pursuant to a contract executed before the mortgage, had statutory priority over all other claims. Nevertheless, the court held that the bank had a right to be equitably subrogated to the claims of materialmen paid with the loan proceeds, reasoning that "the bank's expectation that it was discharging all prior liens"–evidenced by the bank's requirement that the debtor pay known claims out of the loan proceeds–"was clear." *Id.* at 140.

In *In re Cutty's-Gurnee*, 133 B.R. 934 (Bankr. N.D. Ill. 1991), the court, applying Illinois law, held that equitable subrogation was proper to allow a mortgagee bank to succeed to a priority position over another mortgagee. Key to the court's holding was a stipulation by the parties that the mortgagee bank paid off prior liens on the property "with the intent of taking first priority position against the real estate." *Id.* at 963.

In both *Detroit Steel* and *Cutty's-Gurnee*, the court found evidence–the stipulation in *Cutty's-Gurnee* and the inquiry and demand that prior liens be paid out of the loan proceeds in *Detroit Steel*–that the party seeking equitable subrogation intended to take first priority position. In citing these cases, MERS asserts that it refinanced the Debtors' property "with the expectation and intention of stepping into the shoes of the priority [*sic*] of the prior lien holder." (Resp., at 4.) MERS, however, cites to no evidence in the record by which it expressed this intention. The record reveals only that MERS satisfied and released the prior mortgages on the Subject Property and subsequently executed a mortgage on the Subject Property. MERS did so with actual notice that the Subject Property was involved in pending litigation, yet MERS did nothing to establish

its intended priority position. The court will not allow MERS to claim a right of equitable subrogation when it had an available and easy method to advance to first priority, namely, an express agreement to that effect. Thus, the court finds that Harris Bank's judgment lien has priority over MERS's mortgage on the Subject Property and is entitled to prior satisfaction.

## CONCLUSION

For the reasons stated above, Harris Bank's Motion for Summary Judgment is granted [# 9].

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 30, 2005

11